UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                             :

RICHARD D. POWER,             :             02 Civ. 6444 (GEL)
                             :
               Plaintiff,    :
                             :         **OPINION AND ORDER**
        -against-          :
                             :         **FINDINGS OF FACT AND**
TYCO INTERNATIONAL (US), INC.,  :         **CONCLUSIONS OF LAW**
                             :
               Defendant.   :
                             :
------------------------------------------------------x

Kenneth J. Rubinstein, Haynes and Boone,
LLP, New York, New York, for Plaintiff.

Rene M. Johnson, Scott E. Ross, and Diane
L. Lisowski, Morgan, Lewis & Bockius
LLP, New York, New York, for Defendant.

GERARD E. LYNCH, District Judge:

       Plaintiff Richard D. Power brought this action for breach of contract against his former

employer, Tyco International (US), Inc., alleging that Tyco had failed to pay severance benefits

promised to him under an oral contract agreed to by Tyco's former Chairman and Chief

Executive Officer ("CEO"), L. Dennis Kozlowski.   The case was tried before the Court without

a jury on April 25, 2007.  This Opinion sets forth the Court's Findings of Fact and Conclusions

of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  To the extent any

Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law,

and vice versa.  As detailed below, the Court concludes that Tyco breached an agreement to pay

plaintiff severance, and that plaintiff is due damages in the amount of $900,000 plus interest.

**FINDINGS OF FACT**

**I.    <u>Background to the Dispute</u>**

1.  Power was employed by or affiliated in various capacities with Tyco, or its predecessors or affiliates, from 1979 through early 1992 (Stipulated Facts, Joint Pretrial Order § V ("Stip'd Facts"), at ¶¶ 3-5), and again from June 1995 through December 1998.  (<u>Id</u>. ¶¶ 7-11.)

2.  The first period of Power's employment at Tyco ended in January 1992 when Kozlowski, then Tyco's Chief Operating Officer, terminated Power's employment as Chief Financial Officer.  (Stip'd Facts ¶ 5; Tr. 15-16, 18.)  In connection with this termination, Power received a severance package from Tyco pursuant to a written agreement.  The severance package consisted of 24 additional months of continued salary and certain benefits, but not any bonus.  According to the agreement, Power's package represented a "substantial number of additional months of remuneration outside of company policy."  (D. Ex. 2; <u>see</u> Stip'd Facts ¶ 6, Power Dep. 2/9/06 ("Power Dep. I") 26-27.)

3.  The second period of Power's affiliation with Tyco began in 1995, when Power began providing consulting services to Tyco.  In 1997 he again became a Tyco employee, and until 1998 he was employed by Tyco in various capacities, ultimately being assigned to a restructuring project for U.S. Surgical Corporation, a Tyco subsidiary, where he reported to Richard Gilleland, President of U.S. Surgical.  (Stip'd Facts ¶ 8-11; Power Dep. I 30, 37-38, 61-62, 65-66, 68.)

4.  Kozlowski told Power that the assignment to U.S. Surgical "would be financially worth [Power's] while" and that Power could be assured of receiving another position once the assignment was completed.  (D. Ex. 10; see Stip'd Facts ¶ 12, Power Dep. I 282-84.)

5.  In December 1998, Power was informed by Gilleland that his services were no longer required, and that he should contact Kozlowski, by then Tyco's CEO, to discuss his future employment.  Kozlowski advised Power that Power would be reassigned to a new position as soon as one could be identified.  (Stip'd Facts ¶¶ 11-12; Power Dep. I 72-73.)

6.  In January 1999, however, in conversations with Mark Swartz, Tyco's Chief Financial Officer, and later with Kozlowski, Power was notified that he would be terminated.  Power began to negotiate a severance arrangement.  (Stip'd Facts ¶ 13; Power Dep. I 72-74.)

7.  Between January and May 1999, Power attempted to negotiate a severance agreement with Swartz and Irving Gutin, a Tyco in-house attorney, exchanging written draft agreements. The negotiations were unsuccessful.  (Stip'd Facts ¶ 14-15; Power Dep. I 16, 75-76, 82; D. Exs. 8, 12.)  During this period, Power continued to receive a salary and benefits from Tyco.  (Power Decl. ¶ 14.)

8.  While these negotiations went on, Power contacted several attorneys, seeking advice regarding whether he had a claim based on breach of certain oral promises Kozlowski had allegedly made to him regarding employment benefits.  In one such letter, dated April 12, 1999, Power wrote that "Kozlowski has a history of making promises and not keeping the promise." (D. Ex. 11, at 2; see Power Dep. 5/24/06 ("Power Dep. II") at 38-39; D. Exs. 6, 10.)

9.  Also during this period, Power explored other business opportunities.  In May 1999, he was offered a full-time position with another company.  (Power Decl. ¶¶ 15-16.)

3

II.      **Negotiations Regarding Power's Return to Tyco**

10.  In May 1999, in a telephone conversation initiated by Kozlowski and Swartz, Kozlowski proposed to Power that rather than continuing to negotiate a severance package, he should return to work at Tyco.  (Stip'd Facts ¶ 16; Power Dep. I 84-85.)  Power's notes of this or a related conversation with Kozlowski indicate that Kozlowski stated that in connection with such continued employment, "I will write a severance contract up front."  (Power Dep. I 263, D. Ex 75.)

11.  Power then undertook various negotiations with Swartz and Kozlowski regarding the terms of his projected renewed employment with Tyco.  As of June 13, 1999, Power and Swartz had reached an impasse in negotiations.  On June 13, 1999, Power faxed to Kozlowski a document, referred to by the parties to this litigation as the "landscape document," detailing the state of negotiations, listing the various issues under discussion and, in parallel columns, the respective positions on each issue of Swartz and Power, as Power understood them.  (See Tr. 44 (Power).)

12.  No unaltered copy of the original of this typewritten faxed document has been located by either party.  At least two copies containing later handwritten annotations are part of the record.  (D. Exs. 13, 21.)  Although no witness can confirm with certainty that these documents contain an unaltered text of the original fax, it is a reasonable inference under all the circumstances that the typewritten text of these exhibits is identical to what Power faxed to Kozlowski, and the Court so finds.

4

13.   With respect to severance, the landscape document reflects that Swartz's position was "[t]wo years salary — in a written agreement."  Power's proposal, according to the document, was "$1.5 million payable over two years with benefits continued. . . . In a change of control or similar restructuring — the severance mentioned above would be a minimum amount."  (D. Ex. 13.)  Significantly, in light of future developments, the amount demanded was a fixed sum, not a formula based on Power's salary and bonus.

14.   At the time the fax was sent, Power had not reached agreement with Tyco that he would return or continue to work for the company.  Although Tyco argues that certain statements on the first page of the fax demonstrate that Power had already agreed to return (specifically, "I will speak to Paul Montrone on Monday afternoon and plan for an immediate transition. . . . I am pleased to have the opportunity to work for you again."), the overall text of the fax makes clear that these were either conditional statements or pleasantries, that negotiations were still under way, and that no definitive agreement had been reached between the parties on the terms or conditions of any future employment of Power at Tyco, or on whether he would indeed accept any offer.  (D. Exs. 13, 21; see Tr. 57-58.)

**III.   The Conversation Between Kozlowski and Power**

15.   At some time within the next few days, probably on June 14, 1999, during a telephone conversation of uncertain length, Kozlowski and Power reached agreement on the terms of Power's renewed employment with Tyco.  (Power Decl. ¶ 22.)  What if anything Power and Kozlowski definitively agreed upon regarding severance is the principal issue in dispute between the parties.

5

16.  It is undisputed that Kozlowski and Power were the only parties to the relevant conversation, and that no written agreement was ever executed detailing the terms of their agreement.  Although there is contention over the scope of the agreement that prompted Power's return to Tyco, there is no doubt that an agreement was reached.  Power went back to work and was paid substantial amounts of money; he also received a variety of benefits and perquisites, many of which correspond to subjects that were,  according to the landscape document, under negotiation.

17.  With respect to the severance issue, both Kozlowski and Power claim that they agreed that Power's severance payment would be the greater of $1.5 million or two times his salary and bonus in the year prior to termination.  (Power Decl. ¶ 22; Kozlowski Dep. 39, 40-41.) If either Power or Kozlowski or both were reliable and credible witnesses, this would largely settle the matter in Power's favor.

18.  However, the Court does not find either to be an entirely credible witness.

IV.   **Credibility Findings**

A.     **Kozlowski**

19.  There are numerous reasons to doubt Kozlowski's credibility.  First, on June 17, 2005, Kozlowski was convicted in New York State Supreme Court, New York County, of 12 counts of grand larceny in the first degree, one count of conspiracy in the fourth degree, one count of violating New York General Business Law § 352c(5), and eight counts of falsifying business records in the first degree.  The fact that Kozlowski is a convicted felon whose crimes involved dishonesty and fraud bears heavily on his believability.  See Fed. R. Evid. 609(a)(2).

20.  Second, Kozlowski is not an unbiased witness.  There is substantial evidence that he has reason to be hostile to Tyco, and undisputed evidence that he is favorably disposed to Power. As to the former, Kozlowski is the defendant in an action brought by Tyco in which Tyco seeks the recovery of tens of millions of dollars that Tyco alleges he stole or misappropriated, Tyco Int'l v. Kozlowski, No. 02 Civ. 7317 (S.D.N.Y., transferred to MDL Docket No. 1335 (D.N.H.)), and another action by Tyco seeking the disgorgement of millions of dollars due to alleged securities violations, Tyco Intl'l v. Kozlowski, No. 02 Civ. 9705 (S.D.N.Y., transferred to MDL Docket No. 1335), as well in a civil action by the Securities and Exchange Commission ("SEC"), SEC v. Kozlowski, No. 02 Civ. 7312 (S.D.N.Y.), and a securities class action, In re Tyco Int'l Secs. Litig., No. 02 Civ. MD 1335 (D.N.H.), in which Tyco has refused to indemnify him.  As to the latter, Kozlowski and Power have been close personal friends for years (Tr. 116), and Kozlowski is godparent to one of Power's children.  (Power Dep. II 26.)  Power attended approximately 50 days of testimony in Kozlowski's two criminal trials to support his friend, sent a letter to the Court on Kozlowski's behalf in connection to Kozlowski's sentencing, visited him in prison, and continues to exchange letters with him.  (Power Dep. I. 117-21, D. Ex. 103.)

21.  Third, while Kozlowski testified that he reached a definitive oral agreement with Power regarding severance, the record contains evidence that Kozlowski's practice with other employees was to create written agreements memorializing such severance agreements.  (D. Exs. 39-45.)  Power testified that he had never encountered an example of an unwritten employment agreement during his extensive experience reviewing the employment agreements of senior executives of Tyco in connection with due diligence work on various acquisitions and restructurings.  (Power Dep. I 233-34.)

22.  Fourth, in 2002, before leaving Tyco, Kozlowski reviewed a list of employees to be terminated in connection with downsizing, which had been prepared by Swartz, Prue, and Mark Foley, another Tyco executive.  Although Power was on the list, Kozlowski did not inform Swartz or Prue that the termination of Power would trigger a substantial severance payment. (Prue Dep. 96-99, 116-17.)  It would be natural to expect that this liability would be addressed in deciding whether Power should be fired.  Kozlowski's failure to mention the agreement suggests either that it had not been made, or at least that Kozlowski did not remember it at the time, which calls into question his claim that he recalls it now.

23.  Fifth, the Court was deprived of the opportunity to hear Kozlowski's own account of his general practices in negotiating such severance agreements, because Kozlowski repeatedly asserted his Fifth Amendment privilege in response to questions propounded by Tyco on cross-examination regarding those practices.  (See, e.g., Kozlowski Dep. 70-73.)  No doubt the direct confrontation of Kozlowski with written severance agreements with other senior employees would be illuminating: perhaps Kozlowski could have persuasively explained his practices, to Power's advantage, or perhaps the confrontation would have yielded embarrassment and retreat, to Tyco's advantage.  It is unnecessary to draw any particular inference from Kozlowski's invocation of his privilege.  It is sufficient to note that the Court is reluctant to rely on testimony that could not be fully confronted by the adverse party.

24.  Finally, Kozlowski's memory of the relevant conversation was extremely limited. While he purported to be firm in his recollection of the term of his agreement with Power that is at issue in this case, he could not remember important details about other aspects of the negotiation, such as salary, stock options, bonuses, and the forgiveness of a "bridge loan" for

Power's house.  (Kozlowski Dep. 22-23, 31.)  Kozlowski's memory of the severance term was also shaky at best; at first, he recalled that the agreement had been for "[t]wo times his severance and bonus," but could not recall whether there was "another denominator."  (Id. at 39.)  Only after being shown his earlier written declaration did Kozlowski recall that the agreement had been for two times severance and bonus *or* $1.5 million.  (Id. at 40.)  Nor could Kozlowski remember how, or even whether, the parties had resolved issues regarding under what circumstances severance would be due. (Id. at 41.)

25.  Moreover, Kozlowski's memory of at least one important aspect of the severance negotiation was demonstrably faulty.  Kozlowski recalled that his objective in the negotiation had been to get Power to agree to receiving a smaller severance payment than he had received on his prior termination from Tyco, which Kozlowski recalled as being three times his salary and bonus.  (Id. at 50-52.)  In fact, Power had received a smaller severance of twice his salary, without bonus, on his previous firing (Stip'd Facts ¶ 6) and was negotiating to receive a much richer deal on this occasion.  (Kozlowski Dep. 50.)  Thus, Kozlowski's recollection is mistaken as to more than the mere details of the negotiation; Kozlowski claims he was trying to negotiate a smaller severance payment, when in fact the payment Kozlowski claims to have offered Power would have been more than the earlier payment.

26.  Accordingly, the Court declines to accept Kozlowski's testimony.  The Court does not, and need not, conclude that Kozlowski knowingly gave false testimony.  It is sufficient to conclude that he is an unreliable witness, whose faulty recollection may be influenced by a bias in favor of Power and against Tyco, whose testimony could not be fully confronted, and whose character for honesty is too impeachable to permit confidence that in the face of these defects

and difficulties, he could be relied upon to overcome bias and accurately report only clear and accurate recollections uninfluenced by what he has learned since the events in question or by the desire, conscious or otherwise, to shade his recollections in the interest of his friend.

      **B.**    **Power**

    27.  Power's demeanor and business history would incline a factfinder to believe in his honesty.  However, the record discloses a number of troubling facts that would permit unfavorable inferences regarding his credibility.  On a charitable view, these facts permit an inference that Power's recollection of key events is imprecise; a less charitable inference of deception is also possible.

    28.  First, on a number of both small and large matters, Power has given inconsistent versions of his agreement with Kozlowski.  For example, in June 2002, after Kozlowski had been indicted and removed from office, and after Power had been notified that he would be terminated from Tyco as part of a corporate downsizing instituted by Kozlowski's successor, Power wrote to Swartz describing the severance he maintained Kozlowski had agreed to.  In that communication, Power asserted that he had been promised the greater of $2,000,000 or twice his "last[-]ended Fiscal Year salary and bonus," which he proceeded to calculate as a salary of $450,000 plus a bonus of $4,250,000 in cash and $2,000,000 in stock, for a total severance payment of $13,400,000.  (D. Ex. 20; see also D. Ex. 19.)  That payment, he maintained, was to be made in a lump sum.  (Id.)  In the same communication, he also sought a number of other benefits that he said had not been agreed to by Kozlowski, but that he believed he should receive as a matter of fairness, including immediate vesting of any restricted stock he had received.  (Id.)

29.  In his complaint in this matter, however, Power asserted that Kozlowski had agreed to immediate stock vesting as part of the severance payment, and that the cash amount of the agreed severance was to be the greater of $1.5 million — not $2 million — or twice his salary and bonus in the year prior to termination.  (Compl. ¶ 16(h).)  At his deposition, he acknowledged that the claim of a $2 million floor on the agreed severance payment was an error, and said that he now recalled that the agreed minimum payment had been only $1.5 million.  (Power Dep. I 95-96.)  He clearly testified at that time that this was the "one element" in the list of agreed items presented to Swartz "that has a mistake in it."  (Id. at 95.)  At the same time, he maintained that "some of" the items that on the memorandum written to Swartz were clearly *distinguished from* terms agreed to by Kozlowski had in fact been part of his agreement with Kozlowski, and tried to characterize the clear distinction in the memorandum between items that had and had not been agreed to as merely a matter of "[in]artful[] display[]."  (Id. at 97.)

30.  By the time of Power's trial testimony, however, the terms had changed again.  In his declaration submitted in lieu of direct testimony, Power maintained that the severance award would be "the greater of $1.5 million or two times my salary and bonus in the year prior to termination," omitting the claim that Kozlowski had agreed to include as part of the severance the immediate vesting of any stock (Power Decl. ¶ 22) — the term that at his deposition (Power Dep. I 95) and complaint (2d Am. Compl. ¶ 15), but not in his earlier memorandum to Swartz (D. Ex. 20), Power had claimed was part of the agreed severance.  At trial, Power acknowledged that his memory had changed as to whether the severance agreement had included vesting of stock options.  (Tr. 17-18, 27-29.)

11

31.  On cross-examination, moreover, Power testified that the summary given to Swartz had included not one mistake, as he had testified at his deposition, but at least two: in addition to inaccurately stating the cash severance "floor," the memorandum had included $2,000,000 in stock as part of the base for calculating the severance payment, whereas Power now maintained that the agreement had covered only his "cash" bonus and not stock.  (The "error" is hardly insignificant: had Swartz accepted Power's 2002 account, Power's payment would have been $4,000,000 greater than what Power now claims was due.)  (Tr. 15.)[1]  Moreover, while Power represented to Swartz that Kozlowski had agreed that this severance award would be paid in a "lump sum" (D. Ex. 20), the landscape document indicates that Power's own proposal had been for a payout over two years (D. Ex. 13), and on cross-examination at trial Power conceded that the timing of any severance payment had not actually been discussed with or agreed to be Kozlowski.  (Tr. 73.)

32.  Second, important documents that Power has used at different times to support his account of the negotiation with Kozlowski are of uncertain authenticity.  The most important such document is the so-called "landscape document" faxed by Power to Kozlowski in advance of their discussion, summarizing the state of negotiations between himself and Swartz.  As noted above, no unaltered copy of this document appears to have survived.  The oldest extant copy (D.

---

[1] There is another, less significant, inconsistency in the way Power describes the severance agreement.  Power relies upon a "form of agreement" purporting to be a letter to him from TME Management Corp., dated October 25, 2000.  This document, which is discussed at greater length below, was actually drafted by Power.  The "form of agreement" states that the severance Power received would be based on his salary and bonus for the "calendar year" preceding termination.  (D. Ex. 21 at P 0107; see Tr. 123, 128-29.)  In the 2002 memorandum to Swartz, however, Power specified the base amount as "the last ended *Fiscal Year* salary and bonus."  (D. Ex. 20 (emphasis added); see Tr. 119.)

12

Ex. 13) is one that Swartz apparently faxed to Tyco's human resources chief, Patricia Prue, on

June 23, 1999; Power testified that he probably gave this copy to Swartz after his discussion with

Kozlowski.  (Tr. 62; the copy bears a notation in Power's hand, with his initials, addressing it to

"Mark – As we discussed." (D. Ex. 13.))  This copy bears notations in Power's handwriting,

which on several points appear to indicate terms agreed to by Kozlowski.  For example, under

"salary" the typewritten summary of negotiated positions shows that Swartz had offered

$385,000, while Power asked for $425,000; handwritten next to these terms is the notation

"400,000," which all agree became Power's base salary.  There is also a handwritten notation

suggesting that Kozlowski had "OK['d]" a charitable contribution to be made by Tyco at

Power's request, a demand Swartz apparently had not agreed to.  The only handwritten notation

in the vicinity of the severance term is a crossed-out notation "3 yrs — $1.200," which Power

testified was an effort on his part to justify his demand for a $1.5 million severance payment.

(Tr. 62.)  According to Power, he made this calculation to support an argument for three times

the annual salary he and Kozlowski had by then agreed upon (the notation $1.200 being

translated as $1,200,000, or three years' salary at $400,000 per year) plus a small "kicker."  (Tr.

61-62.)

  33.  In 2002, however, in arguing to Swartz that Kozlowski had agreed to a large

severance payment, Power produced another version of this document.  (D. Ex. 21.)  The cover

letter accompanying this version states, "I recall giving you a copy of this document when I

returned to Tyco and briefing you on the agreement I had reached with [Kozlowski]."  The

document, however, is in fact different in a significant way from the copy Power had given to

Swartz in 1999.  The typed text reflecting Swartz's and Power's negotiating positions is

identical, as are most of the handwritten notations (apart from the inscription to "Mark" on the cover page and the notation "P. Prue" apparently added by Swartz before faxing the earlier version to Prue). The 2002 version of the landscape document, however, is significantly altered in the region of the "severance" term. The "3 yrs — $1.200" note is more heavily crossed out, and an additional note in Power's handwriting appears: "$1.5 m or 2x's Salary/Bonus/ OK."

34. Power testified that this was *not*, as a skeptic might infer, an addition made in 2002 to persuade Swartz that Kozlowski had agreed to such a severance payment, but rather was something he had added to his copy of the agreement shortly after the negotiation with Kozlowski in 1999. (Tr. 131.) Clearly, however, the annotation was not made at the same time as the other handwritten notations on the document that unquestionably had been made before June 23, 1999 (because they appear on the copy that Swartz faxed to Prue on that date, D. Ex. 13). Power could give no convincing explanation, however, of why he would have made such a notation on a document in his own file, not during or immediately after his conversation with Kozlowski, and not before but *after* he had given a copy of that document to Swartz in June 1999, apparently for the very purpose of memorializing the terms of the agreement.[2] Oddly, although this litigation began less than two months after Power faxed the 2002 version of this document to Swartz, Power no longer has the original of the document in his possession and cannot account for what became of it; forensic testing of the version of the document introduced into evidence is therefore not possible.

---

[2] Two other minor variations appear on the 2002 version of the document, as compared with the 1999 version: On the cover sheet, next to a discussion of Power's need to extract himself from a company in which he and others had invested if he returned to work at Tyco, Power wrote "Dennis & Mark to buy out," and next to the handwritten salary note "400,000," he had added "OK."

35.  As part of the same effort to document his agreement with Kozlowski in 2002, Power also provided Swartz with another document of dubious origin.  In addition to the second marked-up version of the landscape document, Power provided a document that he identified as "the form of agreement on the forgiveness of the bridge loan."  (D. Ex. 21.)  Power added, "This came up in October 2000 and included the severance agreement as well."  (Id.)  The reference here is to another aspect of Power's compensation: Power had borrowed money from Tyco in connection with buying a house, and negotiated for Kozlowski to forgive the loan as an inducement to him to return to Tyco in 1999.  When the loan forgiveness amount (a total of some $1.6 million, representing a "gross-up" of the original $1,000,000 loan amount in effect to cover the taxes Power would have to pay on the income from the loan forgiveness, see Stip'd Facts ¶ 29) failed to appear on Power's W-2 form for 1999 as required, Power was prompted to make inquiries with Mark Swartz about what had become of the loan forgiveness, after which a Tyco lawyer, Mark Whitman, drafted an agreement memorializing the loan forgiveness for Power to sign.  (Power Dep. I 205-209.)

36.  The draft agreement created by Whitman (D. Ex. 49), dated September 26, 2000, and taking the form of a letter from TME Management Corp., a Tyco subsidiary, to Power (with a space for an "Agreed and Accepted" countersignature by Power) made no mention of any severance agreement between Tyco and Power — as would be expected, since the agreement exclusively addressed the quite different topic of the loan forgiveness, which was not related to severance.  Power never signed the proposed agreement (according to him, this was because the loan forgiveness had been the subject of a prior agreement with Kozlowski, so the new

agreement was unnecessary) and the topic was eventually dropped when the loan forgiveness

appeared on Power's W-2.  (Power Dep. I 208-209, 212; Tr. 151.)

    37.  The "form of agreement" presented by Power to Swartz in 2002 along with the

landscape document is quite different from the earlier draft agreement in a number of respects.

Most significant for purposes of this case, the "form of agreement," for no obvious reason,

asserts an acknowledgment of an agreement for a severance payment with Power roughly

corresponding to the agreement Power claims to have reached with Kozlowski.[3]  (D. Ex. 21.)

Power contends that he created this "form of agreement," dated October 25, 2000, as a potential

counter-proposal to Tyco during the negotiation over the proper method of documenting the loan

forgiveness.  (Power Dep. I. 208.)  (The letter does indeed contain a number of significant

textual variations from Whitman's September 2000 proposal relating to that subject.)  Power

acknowledges, however, that while the document he sent to Swartz in 2002 is cast in a form

indicating it came *from* Tyco *to* Power, in fact it not only originated from Power and not Tyco,

but had never even been sent by Power to anyone at Tyco.  In fact, the "form of agreement" had

never even been seen by anyone other than Power.  (Power Dep. I 210-12.)

    38.  Assuming that this "form of agreement" had in fact been created in 2000, as Power

testified, and was not a total fabrication, it supports two inferences adverse to Power.  First, it

indicates that, contrary to Power's consistent testimony that it was never contemplated that any

severance agreement would be reduced to writing, and that he never felt a writing was necessary

because he trusted Kozlowski's assurances (Tr. 54), Power in fact was attempting in 2000 to

---

    [3] The 2000 draft reflects a severance based on salary and bonus for the preceding
*calendar* year, as opposed to the *fiscal* year base Power was contending for in 2002.  See note 1
*supra*.

obtain from Tyco, by somewhat circuitous means, a written agreement on severance.  Second, it suggests that Power was attempting to deceive Swartz by presenting him with a document purportedly evidencing his agreement with Kozlowski, assertedly a "form of agreement on the forgiveness of the bridge loan" on the letterhead of a Tyco subsidiary and addressed *to* Power, that in fact was Power's own self-serving account of his version of the agreement, composed at the earliest well over a year after the agreement with Kozlowski was reached, that no one at Tyco had ever seen, let alone signed or authored.

39.  Third, Power's character for honesty was undermined when on cross-examination he was confronted with his tax returns for 2000 and 2001.  Power acknowledged on cross-examination that in 2000, he had reported the income recognized as a result of the loan forgiveness — which had been reported to *him* by Tyco as straight "reported W-2 wages" (D. Ex. 31 at P000217), and which had been paid to him as a bonus for his work on Tyco's behalf — on a Schedule C ("Profit and Loss From Business") as the "gross receipts or sales" from a side business of "business consulting."  (D. Ex. 31 at P000224.)  This enabled him to deduct nearly $350,000 in purported expenses, none of which had any relationship to this income.  (Tr. 83; see D. Ex. 31 at P000224.)  Some of these "expenses" of the "business consulting" operation included purely personal legal expenses incurred by Power in connection with his attempt to negotiate severance from Tyco.  (Tr. 84.)

40.  Power pulled a similar maneuver in 2001, listing his $4.2 million bonus from Tyco as Schedule C income from a purported "consulting services" business, and setting off against this nearly $900,000 in deductions for "expenses" of this apparently quite substantial business, including nearly 300,000 in travel and entertainment expenses and $144,724 in interest that at his

17

deposition he admitted was incurred in connection with his home mortgage.  (D. Ex. 32 at

P001438; Tr. 86-88.)[4]  Power's habit of  "creative" tax accounting is a good reason not to rely on

Power's unsupported word with respect to financial matters where his personal financial interest

is at stake.

41.  Fourth, Power's testimony on at least one critical matter is implausible.  Power

maintains that he found it unnecessary to obtain a written agreement governing the terms of his

severance because he trusted Swartz and Kozlowski to do what they had promised whether or

not it was in writing.  (Tr. 54.)  He testified that it "made no difference" to him whether the

agreement was in writing, because he "felt that if there was going to be a meeting of the minds of

commercial agreement, that the parties as gentlemen and as people who have the ability to do it

can enter into it, [and] that that would be fine by me."  (Tr. 53-54.)  Of course, these contentions

are in Power's interest, because Tyco has consistently maintained in this litigation that any oral

agreement between Power and Kozlowski, particularly with respect to severance, could only

have been provisional, and must have contemplated further negotiations resulting in a written

agreement before the parties could have intended to be bound.  (See, e.g., D. Proposed Findings

at 17; Answer ¶ 15.)

42.  But Power's explanation of the absence of a written agreement is contradicted by

common sense, as well as by Power's contemporaneous comments and subsequent behavior.

Anyone would understand that, regardless of any legal rule or doctrine, a promise documented in

_____

[4] Power is not a financial or tax naif.  He holds both bachelor's and master's degrees in
business (Power Decl. ¶ 2); his quite complex tax returns in both years were self-prepared (D.
Ex. 31, 32); and before working at Tyco (where he was for many years Chief Financial Officer),
he was employed for some years as an accountant and audit manager at Price Waterhouse & Co.
(Power Decl. ¶¶ 3-4; Kozlowski Dep. 15.)

writing is less easily denied or renounced, and is easier for the recipient to prove should a
dispute arise, than an oral promise.  This is not solely a matter of trust: it is only common sense
that the potentially complicated terms of an employment agreement such as the one being
negotiated between Power and Kozlowski would involve details that would not be easy to
remember, particularly since severance agreements may not be performed until many years have
gone by.  Indeed, Power himself created the landscape document, two pages of summary details,
in order to have a written framework even for what was to be discussed.  He made notes on the
document to memorialize at least some issues on which agreement had been reached, and
provided a copy of the annotated document to Swartz within days of reaching agreement with
Kozlowski in connection with briefing Swartz on the terms that had been reached.  That is not
the behavior of a person who fails to understand the value of written memorializations of events
as important as this agreement.

43.  Moreover, contrary to Power's testimony, contemporaneous evidence makes clear
that he did *not* fully trust Kozlowski.  Kozlowski had, in Power's view, failed to follow through
on commitments made orally to Power, a fact Power stated in writing to several attorneys he
consulted during the process of negotiating his expected departure from Tyco.  Indeed, in one
case he explicitly stated that "Kozlowski has a history of making promises and not keeping
[them]."  (Tr. 109.)  Thus, far from believing that Kozlowski was a "gentleman" who could be
trusted to keep his word, Power had every incentive to seek a written agreement.

44.  Moreover, approximately 16 months after his negotiation with Kozlowski, Power
apparently contemplated getting his version of the severance agreement recorded, preparing a
draft in October 2000 of the projected loan forgiveness agreement that would have included a

19

written acknowledgment of his version of the severance commitment.  (D. Ex. 21.)  The idea of reducing any severance agreement to written form was not a new idea.  The landscape document makes clear that when the bargaining between Swartz and Power had reached an impasse, Swartz's best offer had been "two years salary — in a written agreement."  (D. Ex. 13.)  It is a reasonable inference that Swartz had offered a written agreement as an inducement or concession to Power, who felt that previous oral promises to him had not been kept, but regardless of who first broached the idea of a written agreement, the proposal was on the table, and was regarded by Power as a sufficiently important part of the negotiations to be recorded in the extremely summary memorandum of the parties' position that he prepared for Kozlowski.

45.  Thus, regardless of the actual legal effect of the failure to memorialize whatever agreement was reached, and regardless of any factual inference that could be drawn from the mere fact of such failure, Power's insistence at trial that in June 1999 he had no interest in having the severance agreement reduced to writing appears to be a conscious or unconscious shading of the truth in light of what he now perceives to be in his litigation interest.

44.  Accordingly, the Court is unpersuaded that Power's testimony can be accepted at face value as credible.  As with Kozlowski, the Court does not, and need not, conclude that Power knowingly falsified his testimony.  It is sufficient to conclude that he is an unreliable witness, whose recollection may be influenced, consciously or otherwise, by his strong financial interest in the outcome of this case.

## V.    Circumstantial Evidence

46.  The fact that Kozlowski and Power are unreliable witnesses does not mean that no agreement was reached; it simply means their testimony cannot be relied on.  Because the

testimony of the only two parties who participated in the critical conversation is unreliable, it will be necessary to look to evidence other than that testimony to determine what took place, which in this case means examining circumstantial evidence to see whether the events surrounding the conversation corroborate or contradict the witnesses' version of events.

47.  Tyco argues that contemporaneous documents, and the consistent practices of Kozlowski and Tyco, support an inference that Kozlowski did not agree to a severance payment to Power.  Power testified that he briefed Prue and Swartz on the terms of the agreement he had reached with Kozlowski, and that he had given Swartz a copy of the landscape document in connection with this briefing.  (Tr. 63-65.)  The copy of that document that was given to Swartz at that time, however, did not have any handwritten note indicating that agreement had been reached on the severance issue.  (D. Ex. 13.)  Prue remembered no such briefing, testifying that the first time she had heard of the purported severance agreement was when Power was terminated (Prue Dep. 117), but that she had prepared a memorandum regarding the financial terms of Power's continued employment with Tyco on the basis of what Swartz had told her and the copy of the annotated landscape document that Swartz gave her.  (Prue Dep. 51-52; D. Ex. 13.)  The memorandum Prue prepared does not contain any reference to a severance agreement. (D. Ex. 14.)  Both Kozlowski and Swartz signed off on the memorandum (id.), which might suggest an inference that neither Kozlowski nor Swartz (who had been briefed by Power) believed that the agreement contained a severance term.

48.  For at least two reasons, however, the Prue memorandum cannot be taken as an authoritative memorialization of all of the terms of the agreement.  First, the Prue memorandum was never shown to Power, and he never agreed to or confirmed it.  (Tr. 67; Prue Dep. 51.)

Second, the Prue memorandum also does not refer to any agreement that Tyco would contribute to Power's charity, or that Kozlowski would see to buying out Power's investors.  (D. Ex. 14.) Power's testimony that these terms were agreed to is corroborated by the undisputed fact that Kozlowski fulfilled both promises shortly after Power returned to work.  (Stip'd Facts ¶ 31.) Nevertheless, the absence of a severance term from the memorandum is striking, and carries some weight.

49.  It would be extremely unusual for a severance agreement of the sort Power contends was made not to be committed to writing.  Unlike an agreement as to salary, for example, which would be put into execution immediately, or the agreements with respect to the buy-out of Power's investors or the charitable contribution, which were expected to be fulfilled within a short period, a severance agreement might not need to be fulfilled for years, perhaps even (as in fact occurred) not until after Kozlowski had left the company.  It would thus be extremely imprudent and unlikely for the parties to rely on memory in connection with an important term that would likely not become effective until some uncertain future date.

50.  Moreover, there is no evidence that any other Tyco employee had such an oral severance agreement.  As discussed above, Power never encountered a single oral severance agreement in his work at Tyco, which included reviewing the terms of various executives' compensation in connection with restructurings or acquisitions.  (Power Dep. I 233-34.) Kozlowski apparently entered severance agreements with a number of employees, but all of them were reduced to writing in the form of term sheets, offer letters, and occasionally formal contracts.  (D. Exs. 39-45.)  In January 2002, Kozlowski put a number of such arrangements with other executives before the Compensation Committee for approval; Power was not among them.

(Foss Dep. 29-30; D. Exs. 36, 37.)  Moreover, the Prue memorandum suggests that whatever

Power expected, Tyco, as represented by Kozlowski, Swartz and Prue, wished to have a record

of the provisions of Power's agreement relating to compensation.  The failure of either side to

put the terms of the purported agreement into even the most informal written memorandum thus

argues strongly against a conclusion that severance was agreed upon.

51.  Some of the circumstances, however, support at least some aspects of Power's

account of what transpired.  Power's claim that obtaining some guarantee of future severance

benefits was a priority for him in the negotiation, and indeed that he would not have returned to

work without one (Power Decl. ¶ 19, 33), is entirely credible in light of the circumstances.

Power had recently been advised that his Tyco employment was being terminated, and he had

been unable to work out a satisfactory severance settlement.  If he returned to Tyco, he would be

giving up other potentially lucrative business opportunities, and past experience suggested to

him, as detailed above, that he could not count on Kozlowski to continue to employ him

indefinitely.  Moreover, the landscape document makes clear that Power was in fact negotiating

the terms of severance with Swartz, that the parties were in agreement that some amount of

severance would be promised, and that Power was seeking a lucrative severance payment of $1.5

million.

52.  Tyco argues that the conduct of the parties after Power's return to Tyco suggests that

the parties did not see themselves as being bound by an agreement.  (D. Proposed Findings 17-

18.)  First, Tyco points out that various Tyco documents post-dating the alleged agreement do

not mention severance.  This is true, as discussed above.  This fact, although it certainly shows

that Kozlowski made no effort to memorialize the agreement or to ensure that Tyco gave Power

the severance he had been promised, may be informative as to when Kozlowski broke his promise, rather than whether he made one.  While the lack of subsequent documentation could be seen as evidence that no agreement was reached, it is more consistent with the totality of the evidence in this case to conclude that Kozlowski promised Power severance and then failed to take the necessary steps to ensure that he got it; that is, the evidence suggests that Kozlowski either decided at a very early point not to give Power the severance or simply forgot about it.

53.  Tyco also argues that the parties' later conduct was inconsistent with an agreement being formed because Power was actually paid more than the $400,000 salary and $650,000 bonus to which he claims he was entitled under the agreement.  (D. Proposed Findings 18.)  But this fact simply reflects that money was dispensed freely under the Kozlowski regime, which in turn makes Power's theory of the case — that Kozlowski made an oral promise of severance payments going beyond what was internally documented by Tyco, and that Power was comfortable with that arrangement — more plausible.

54.  The circumstances of Power's return to Tyco strongly suggest that he would not have agreed to renew his employment with Tyco unless some satisfactory assurance had been provided that he would be paid a severance benefit, at least if he was terminated without cause.  Since it is clear from subsequent events that Power and Kozlowski did reach an agreement on terms of employment, and Power did return to work at Tyco, it is plausible to conclude that Kozlowski did in fact make a commitment to some form of severance payment to Power.

55.  Exactly what that commitment was, however, is more difficult to infer.  Power urges that his version of what transpired should be credited, because the other terms of the agreement

24

that he maintains was made were in fact carried out.[5]  The Court rejects any such inference.  That Tyco made a contribution to Power's favorite charity, for example, something Power had asked for in the landscape document, confirms that Kozlowski agreed to this demand.  But that says nothing about whether Kozlowski promised to do something that Tyco *failed* to do.

56.  At the same time, Tyco's non-performance of the purported severance agreement, when it did honor other promises purportedly made by Kozlowski, does not support an inference that Kozlowski had *not* made such a promise.  By the time the issue of severance arose, Kozlowski had himself been terminated, and it is clear from the behavior of the new Tyco management that it had little interest in honoring supposed oral promises by Kozlowski, who was viewed as having looted the company.  Tyco's failure to pay thus says nothing either way about whether Kozlowski had made such a promise.

57.  The circumstances of the negotiation make it unlikely that the severance term was what Power says it was.  In 1992, when Power was last terminated by Tyco, he had received a severance benefit of two years salary — not including bonus payments — paid out over two years (in effect, a two years' continuation of his salary without bonus).  Following his announced

---

[5] Power concedes that the supposed agreement was incomplete in certain respects.  In particular, he concedes that he and Kozlowski did not explicitly agree on whether a severance payment would be required in various potential circumstances, and did not even discuss some possible scenarios.  (Tr. 5-7.)  Contrary to Tyco's contention, this failure is not fatal to Power's claim.  Power and Kozlowski both testify that there was a clear understanding that severance would be paid in the event that Power was fired without cause.  (Power Decl. ¶ 22; Kozlowski Dep. 38-41.)  This is the most common situation in which severance would be provided.  It would be less usual to pay severance if an employee quit for his own reasons, or was fired for cause, and a payment in the event of disability would ordinarily be treated as a kind of insurance or disability benefit, not as a severance payment.  Thus, the Court concludes that the parties' failure to discuss or agree on such scenarios simply means that no severance would be due under these circumstances, and does not make it any more or less likely that the parties reached agreement on a severance to be paid if Power was fired without cause.

termination in January 1999, draft severance plans proposed by Tyco proposed one year of continued salary payments, and made no reference to a bonus.  (D. Exs. 8, 12.)  (Power testified at his deposition that he was unable to recall what he had proposed as a counter-offer.  (Power Dep. I 81.))  As of June 13, 1999, Power was seeking a severance payment of $1.5 million, which was slightly in excess of three years of the salary he was requesting; Swartz, in contrast, had offered a written promise of two years' salary, which, given that Swartz proposed a salary of $385,000, amounted to a severance payment of $770,000.  (D. Ex. 13.)

58.  Kozlowski claims to recall that he was trying to limit Power's bonus to two years' pay (including bonus), rather than three, which Kozlowski incorrectly recalled Power had received at the time of his past termination.  (Kozlowski Dep. 50-52.)  While Kozlowski is wrong about what Power had received, his testimony is at least consistent with the view that he was not negotiating to *increase* Power's severance benefit, but felt he was negotiating to limit Power's demands.  The parties could thus be expected to have arrived at a severance figure somewhere between $800,000 (two years' salary, as offered by Swartz, once Kozlowski and Power had agreed on a $400,000 annual salary), and $1,500,000 (the amount requested by Power).

59.  While the record is unclear as to what Power had received as salary and bonus in years prior to 1999, Tyco's compensation structure was well understood at that time to involve a "pay for performance" philosophy in which a large part of any senior executive's compensation would be in the form of bonuses, not guaranteed salary.  (Foss Dep. 17-18.)  In actual fact, Power's bonuses for 2000 and 2001 were $1.75 million and $4.2 million, respectively.  (Stip'd Facts ¶¶ 21-22.)  Indeed, Power received a $750,000 bonus in 1999 simply for the "stub period"

from June to September 1999 (Stip'd Facts ¶ 20), and the record indicates that Power and

Kozlowski had agreed on a minimum bonus of $650,000 for fiscal 1999.  (D. Ex. 14.)

Moreover, Kozlowski and Power had agreed that Power's annual bonus would be equal to that of

Swartz (D. Exs. 13, 14), and Swartz was among the highest paid executives at the company.

(Foss Dep. 19-20.)  It is thus a reasonable inference that Kozlowski would have anticipated that a

severance payment of two times salary *and bonus* would likely lead to severance payments well

in excess of the $1.5 million that Power was demanding.  There is thus little reason to infer that

Kozlowski would have made the offer that he and Power now say he made, particularly in view

of Kozlowski's testimony that his negotiation goal was to *reduce* the amount of severance Power

would receive.  (Kozlowski Dep. 50-52.)

## VI.    <u>Ultimate Findings</u>

60.  Accordingly, the Court confidently finds by a preponderance of the evidence that

Kozlowski and Power did *not* agree that in the event Power was terminated without cause, Power

would be due a severance payment of two times his salary plus bonus for the preceding year.

61.  Whether Power was promised *anything* in the form of severance is a closer question.

The strongest arguments against such a conclusion are based on the unconventionality of the

arrangement.  It would indeed be unusual for the parties to reach an oral agreement on this

subject, but in the end, the Court is convinced they did so.  Kozlowski's stewardship of Tyco

was in many respects unusual, and his personal friendship with Power might account for lesser

formality between them than was customary even for Kozlowski.  Severance was important to

Power, who had been twice terminated at the time of the conversation, and the context of the

27

negotiations makes it very unlikely that the parties failed to reach agreement on some form of severance payment.

62.   The Court concludes by a preponderance of the evidence that Power was promised a severance payment of twice his annual *salary*. Such a conclusion would be consistent with the negotiating objectives of the parties, and with their previous dealings. Power was paid twice his salary on the occasion of his previous termination from Tyco in 1992. Power was offered one year of severance payments in 1999 in connection with his intended departure. The negotiations with Swartz over Power's return stalled with Power demanding a severance payment of $1,500,000, and Swartz offering two years' salary. It is thus extremely unlikely that Power and Kozlowski would have agreed on terms that were either less favorable to Power than what Swartz had already offered (no severance at all) or more favorable to Power than what Power demanded (two years' salary plus bonus, an amount predictably higher than Power's demand).[6] It appears that annual salary was the basic unit of negotiations, and it is thus likely that the final agreement would have been expressed in terms of this unit.

63.   Moreover, such a conclusion is supported by a reading of the Court's credibility findings. Having observed their testimony carefully (in person or on video), the Court does not believe that Power and Kozlowski are simple liars, conspiring to make up a severance agreement that has no basis in reality. That both witnesses are, consciously or otherwise, shading their

---

[6] Of course, no single term of a contract is negotiated in isolation, and it would not have been irrational for the parties to have reached an agreement on severance that was extremely favorable to one side or the other in return for concessions made on other terms. Nothing about the pattern of agreement on other terms in this case, however, suggests that either side received such extreme concessions on other points as to have agreed to a severance term less favorable than the other side's previous best offer.

testimony in a way that favors Power's exaggerated claim, on the other hand, seems quite likely. Memories are fallible, consciences are malleable, and it is quite easy for an aggrieved employee to recall an unwritten agreement, entered several years earlier, calling for a severance obligation of two years' salary, as an agreement instead on severance of two years' *pay*, including bonus.[7] Power's salary for fiscal year 2001 was $450,000, and the parties have agreed that fiscal 2001 is the relevant year (P. Proposed Conclusions of Law 2 n.1), so Tyco's obligation to Power amounts to $900,000.

64.   As to how the severance would be paid, the evidence suggests that the parties understood that the payment was to be over the course of two years, rather than in a lump sum. Power testified at trial that he and Kozlowski never discussed whether the severance payment would be in the form of salary continuation or a lump sum (Tr. 144), and Kozlowski could not remember how the severance was to be paid.  (Kozlowski Dep. 180.)  Although Power in 2002 claimed that the severance was to be paid in a lump sum (D. Ex. 19), Power's own proposal, as recounted in the landscape document in 1999, was for the severance to be paid over two years. (D. Ex. 13.)  This was clearly Tyco's preference, as evidenced by the fact that it sought to pay him over time during the later negotiations between Power and Swartz.  (Power Dep. I 107.)  It is highly unlikely that Kozlowski would have countered Power's own proposal for payment over time with a proposal for lump sum payment.  Moreover, as discussed above, the severance

---

[7] The Court is, most emphatically, not imposing on the parties a term on which they did not agree, but that the Court thinks is fair; the Court is making a finding of fact about what most likely was agreed upon.  Nor is this finding based on speculation, even though it does not correspond to the testimony of either participant in the final negotiation.  It is based on reasonable inferences from the circumstances surrounding the negotiation and the testimony of the participants, taking into account the weaknesses in the witnesses' credibility.

benefit Power received after his 1992 termination from Tyco was paid in this fashion, and the draft severance plans exchanged in February and April of 1999 (D. Exs. 8, 13) also proposed payment over time, so it is reasonable to conclude that the parties would have understood this to be Tyco's practice and the natural arrangement.  Accordingly, the Court concludes that Power and Kozlowski understood that severance benefits would be paid in the form of salary continuation for two years.

## CONCLUSIONS OF LAW

In light of the conclusion above that Power and Kozlowski reached an agreement regarding Power's severance, the only legal issue to be addressed is whether that agreement constitutes a legally enforceable contract.  Tyco makes three arguments as to why there is no contract: first, that the facts of this case do not amount to an oral contract; second, that any agreement would be void under the Statute of Frauds, and, third, that any agreement would be void as permeated by fraud.[8]  Tyco also argues that Power is not entitled to prejudgment interest. Each argument is without merit.

## I.    __Breach of Contract__

1. To prevail on a claim for breach of contract under New York law, a plaintiff must prove (1) the existence of an agreement; (2) performance of the contract by the plaintiff; (3) breach of the contract; and (4) damages.  Clalit Health Services v. Israel Humanitarian Found., 385 F. Supp. 2d 392, 397 (S.D.N.Y. 2005).  In this case, there is no question that Power performed by resuming his employment at Tyco, that Tyco failed to pay severance, and that

---

[8] Tyco has withdrawn its earlier contention that Kozlowski lacked the authority to enter into the agreement with Power.  (Tr. 94.)

Power was thereby damaged.  The only question in dispute, therefore, is whether Tyco was obligated to pay severance; that is, whether an oral agreement existed in the first place.

2.  Under New York law, parties are free to contract orally; "oral agreements are binding and enforceable absent a clear expression of the parties' intent to be bound only by a writing." Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 109 (2d Cir. 2003).  "This freedom to contract orally remains even if the parties contemplate a writing to evidence their agreement."  Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1985).

3.  It is the intent of the parties that determines whether and when an oral contract was formed.  Id.  In determining whether the parties had such an intent, "[t]he court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  Id.  These circumstances may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings."  Id., quoting Restatement (Second) of Contracts § 27 comment c (1981).  "No single factor is decisive, but each provides significant guidance."  Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997).

4.  Thus, it is clear that the law permitted Kozlowski and Power to reach an oral agreement concerning severance.  The question in this case, then, is whether they did so.  This is at bottom a factual one, and is essentially resolved by the Court's factual finding that an agreement was indeed reached.  Nonetheless, it is useful to apply the factors by which courts determine whether an oral agreement existed to the facts of this case.

**A.      Reservation of the Right Not to Be Bound Absent A Writing**

5.  "[I]f either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract."  Winston, 777 F.2d 78, 80.  In this case, there is no evidence that either party expressed an intent to be bound only by a writing.  Tyco argues that "both Kozlowski and Swartz contemplated a written severance agreement" (D. Proposed Findings 23), but this is immaterial.  Parties to an oral agreement may contemplate or even desire a writing, but "to avoid the obligation of a binding contract, at least one of the parties must express an intention not to be bound until a writing is executed."  Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 570 (2d Cir. 1993).  In this case, Tyco offers no evidence that anyone expressed such an intent.

**B.      Partial Performance**

6.  As to the second prong, there was clearly partial performance of the alleged agreements, and Tyco's submissions do not attempt to argue otherwise.[9]  Power, of course, performed by returning to work at Tyco.  Tyco paid his salary and bonus (the fact that Power was paid more than agreed to, as discussed above, does not undermine the conclusion that Tyco was obligated to pay a certain amount), awarded him stock options and vesting of previously agreed upon stock options, and forgave the bridge loan, as promised.  It cannot seriously be argued that these actions did not constitute partial performance of Tyco's obligations under the employment agreement.

---

[9] Instead of discussing partial performance, Tyco's submissions contend that the parties' actions after the formation of the alleged agreement were inconsistent with the existence of a contract.  This argument is rejected, for the reasons discussed above.

C.     **Agreement On All Material Terms**

7.  Tyco argues that Power and Kozlowski failed to reach a meeting of the minds on several key terms of the contract.  In support of this argument, Tyco points to the inconsistencies in the way Power and Kozlowski characterized the agreement after the fact, as described in the Court's findings above.  For the reasons discussed above, however, the Court has concluded that these inconsistencies were the product of unreliable memory and a desire — conscious or unconscious — to shade the facts in a way that benefitted the witnesses, and not indicative of an entirely fabricated agreement.  The fact that the parties later exaggerated the scope of the agreement does not mean that no agreement existed.  As discussed earlier, the Court declines to rely on either witness's testimony in concluding that an agreement was reached, but the circumstantial evidence suggests that despite the various later characterizations of the agreement, Power was promised a severance payment of twice his annual salary.

8.  Tyco also argues that the inconsistent later characterizations reflect issues that remained in dispute between the parties.  It is true that the agreement was incomplete in certain respects, as Power concedes.  Power and Kozlowski did not explicitly agree on whether a severance payment would be required in various potential circumstances; some possible scenarios were not even discussed.  (Tr. 5-7.)  This fact, however, simply reflects that Tyco was not obligated to pay severance in situations where Kozlowski and Power had not agreed that severance would be due, and does not invalidate Kozlowski's promise to pay in other circumstances.  Similarly, Tyco contends that Power and Kozlowski never discussed what would happen if Kozlowski left Tyco before Power, as in fact happened, but there is nothing to suggest that Power's severance package was conditional on Kozlowski remaining at Tyco.  Tyco has

withdrawn its defense of lack of authority, and it can therefore be assumed that when Kozlowski promised Power severance, he did so on behalf of Tyco, which is bound by his promises; accordingly, there was no need for this contingency to be discussed.

9.  "[W]here the parties have completed their negotiations of what they regard as essential elements, and performance has begun on the good faith understanding that agreement on the unsettled matters will follow, the court will find and enforce a contract even though the parties have expressly left these other elements for future negotiation and agreement." Metro-Goldwyn-Mayer, Inc. v. Scheider, 40 N.Y.2d 1069, 1070-1071 (1976) (internal citation and quotation marks omitted).  In this case, even if certain issues were left to the later agreement of the parties, or simply were ignored, none of the undiscussed contingencies are material to the agreement that Power would receive severance in a given amount in the event of a termination not for cause, as the Court held in its prior opinion denying summary judgment in this case. Power v. Tyco Int'l (US), Inc., No. 02 Civ. 6444, 2006 WL 3267276, at *2 (S.D.N.Y. Nov. 8, 2006).  Because Tyco has pointed to no material terms that were left open, the Court concludes that there was agreement on all material terms of the contract.

### D.    Type of Agreement Reduced to Writing

10.  Finally, Tyco points out that an executive employment agreement is the kind of agreement that is typically reduced to writing.  Power makes no attempt to argue that executive severance agreements are normally oral, but contends that Tyco operated more informally than most companies.  He notes that Prue, another senior executive, testified that she had no written employment agreement (Prue Dep. 18, 26-27), and that Foss, a member of the Compensation Committee, testified that Tyco's senior executives generally did not have employment contracts.

(Foss Dep. 17-18.)  While it may be true that employment agreements were sometimes not written, Power is unable to point to any other examples of oral *severance* agreements at Tyco.

11.  Although severance agreements are typically reduced to writing, even at Tyco under Kozlowski's stewardship, this is only one factor to be considered.  New York law does not say that the parties may not enter into an oral agreement where such an agreement is ordinarily in writing; it says only that this factor should be considered, and it has been.  Although this fourth factor does not point in Power's favor, the <u>Winston</u> factors on balance point to a contract.

12.  Accordingly, the Court concludes that the agreement reached by Kozlowski and Power constituted a binding oral contract, which was breached when Tyco failed to pay severance upon Power's termination.

## II.    Statute of Frauds

13.  Tyco argues that any agreement between Power and Kozlowski would have been void under the Statute of Frauds, <u>see</u> N.Y. Gen. Ob. L. § 5-703, because it included forgiveness of a loan that had been secured by a lien on his New Hampshire property.  (D. Post-Trial Submission 34.)

14.  Power contends that the loan forgiveness was not in fact part of the original agreement; rather, Power was entitled to a bonus, which Tyco elected to provide in the form of loan forgiveness.  (Tr. 150-51.)  Defendant offers no evidence suggesting otherwise.  Even if the agreement did at one point concern real estate, however, "so much of the parties' alleged contract as provided for the conveyance of real property [was] fully performed several years prior to the commencement of the action. As such, 'the present controversy is not in respect of the land', and the statute has no application."  <u>Knight v. Kirker</u>, 610 N.Y.S.2d 678, 679 (3d

Dep't 1994), quoting <u>Bork v. Martin</u>, 132 N.Y. 280, 284 (1892).  "[D]efendant, having reaped

the benefit of plaintiff's performance of [his] oral promise . . . , may not now avoid [its]

performance under the contract by, in effect, arguing that plaintiff's performance could not have

been compelled."  <u>Id</u>.

### III.   Whether the Contract Was Permeated By Fraud

15.   Defendant's argument that the contract is permeated by fraud is equally meritless.  It

is true that New York policy prohibits the enforcement of contracts where a party engages in

fraud in the course of performing the contract.  As the New York Court of Appeals has said, "we

in New York deny awards for the corrupt performance of contracts even though in essence the

contracts are not illegal."  <u>McConnell v. Commonwealth Pictures Corp.</u>, 7 N.Y.2d 465, 470

(1960).  However, "[t]here must at least be a direct connection between the illegal transaction

and the obligation sued upon."  <u>Id</u>. at 471.  Tyco has identified nothing unlawful about

Kozlowski's promise to pay severance or about Power's performance of his employment duties

under the contract.

16.   While Tyco argues that the oral agreement should not be enforced because "Power

would continue to benefit from . . . the fruits of illegal conduct in which both he and Kozlowski

participated" (D. Proposed Findings 28), it identifies no sense in which the employment

agreement was an agreement to perform unlawful services, and nowhere in its proposed findings

does Tyco ask the Court to find that Power participated in unlawful conduct in the course of his

employment.  Nor did Tyco introduce any evidence at trial tending to prove unlawful conduct by

Power.  Kozlowski's unlawful actions at Tyco are a matter of public record, but Tyco has not

tied them in any sense to the obligation sued upon.  Tyco has dropped its contention that

Kozlowski exceeded his authority in entering the severance agreement, which was perhaps the basis of its claim that the contract was unlawful, and indeed, Tyco's post-trial submission does not raise this argument, perhaps indicating it has been abandoned.[10]   In either event, the argument is without merit.

## IV.   **Prejudgment Interest**

17.   Under New York law, the source of the right to prejudgment interest is N.Y. C.P.L.R. § 5001.   Section 5001(a) provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract", § 5001(b) states that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed", and § 5001(c) provides that the date from which interest is to be computed is a question of fact.   See Ginett v. Computer Task Group, Inc., 962 F.2d 1085, 1101 (2d Cir. 1992).

18.   Tyco's pre-trial submission argued that fairness required a denial of prejudgment interest, because there was a "bona fide dispute" between the parties concerning the existence of the severance agreement and its terms and because the case had been stayed upon the application of the New York District Attorney.   (D. Proposed Findings 28-29.)   However, "since CPLR § 5001 is obviously phrased in mandatory terms, New York law does not permit the trial court to exercise any discretion with regard to prejudgment interest determinations."   United Bank Ltd. v. Cosmic Int'l., Inc., 542 F.2d 868, 878 (2d Cir. 1976).   Tyco's pre-trial submission does not argue

---

[10] Plaintiff contends that Tyco withdrew its claim that the contract was permeated by fraud in the Agreement of Partial Settlement of April 2006, in which Tyco withdrew its counterclaims.   (P. Post-Trial Submission 24 n.16.)   The Court assumes from Tyco's inclusion of the permeated-by-fraud argument in its Proposed Findings, submitted in April 2007, that Tyco interprets the partial settlement differently, but as the argument is without merit, the Court need not decide whether Tyco abandoned it.

that this case fits into any exception to this rule, and its post-trial submission makes a different argument entirely: that prejudgment interest should be denied because it is not possible to determine when Power's cause of action accrued.  (D. Post-Trial Submission 34-35.)

19.  Tyco contends that because Power and Kozlowski never reached agreement as to whether Power's severance was to be paid as a lump sum or over a two-year period, it is not possible to determine when payments would have been due under the agreement.  (D. Post-Trial Submission 34-35.)  For the reasons discussed above, however, the Court finds that the parties understood that severance would be paid over the course of two years.  Accordingly, prejudgment interest should be calculated beginning from the reasonable intermediate date of June 28, 2003, one year after Power's termination and halfway through the period during which the payments were due.  See N.Y. C.P.L.R. § 5001(b) ("Where . . . damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."); Conway v. Icahn & Co., 16 F.3d 504, 512 (2d Cir. 1994) (noting that "where damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest.").

## CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff has proven, by a preponderance of the evidence, that defendant breached its agreement to provide plaintiff with severance pay.  Accordingly, the Court awards plaintiff damages totaling $900,000, plus interest at the rate of 9% per annum from the date of June 28, 2003.

SO ORDERED.

Dated: New York, New York
       May 29, 2006

GERARD E. LYNCH
United States District Judge

39